<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| Luz M.M.,[1] | |
|     Plaintiff, | No. 25cv11998 (EP) |
|     v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
|     Defendant. | |

**PADIN**, **District Judge.**

Plaintiff Luz M.M., who suffers from various physical impairments, appeals from the Social Security Administration's ("SSA") denial of disability insurance benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. § 401 (the "Act"). D.E. 1 (the "Appeal").

The Court has considered the parties' submissions and decides Luz's Appeal without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **GRANT** the Appeal, **VACATE** the denial, and **REMAND** for further proceedings consistent with this Opinion.

---

[1] To protect the privacy interests of plaintiffs in social security cases, the Court adopts the recommendation of the Judicial Conference of the United States to refer to plaintiffs in social security cases by their first name and last initial. *Philip L.S. v. Comm'r of Soc. Sec.*, No. 24-8559, 2025 WL 3719692, at *1 (D.N.J. Dec. 23, 2025).

## I.      BACKGROUND

### A.      Factual Background[2]

#### 1.      *Medical records regarding Luz's arm and hand*

Luz's medical records date back to September 24, 2019.  D.E. 4 ("Record" or "R.") at 311.[3] On that date, she appeared at the Hospital for Special Surgery and saw Dr. Daniel Osei for pain in her left wrist and in her right hand.  *Id.* at 312.  She complained of sharp pain and swelling in both her thumbs, which worsened with typing.  *Id.* at 328–29.  She stated she was unable to do activities like cutting her plants.  *Id.*  She also told Dr. Osei that she faced severe difficulty in opening jars and in activities that required taking force through her arm, shoulder, or hand, such as hammering or playing tennis.  *Id.* at 328–33.  At that visit, Dr. Osei provided Luz with an injection to treat the pain in her right hand.  *Id.* at 315–16.

Luz returned on January 31, 2020.  *See id.* at 360.  She reported feeling pain relief for about three weeks after receiving the previous injection but complained that her pain subsequently returned and worsened.  *Id.*  A physical examination demonstrated that she had excellent range of motion but showed effusion along her fingers.  *Id.* at 361.  Dr. Osei ordered blood tests and imaging.  *Id.* at 363.

Luz returned to Dr. Osei to review her imaging results on February 28, 2020.  *Id.* at 376. A physical examination demonstrated that her range of motion remained excellent.  *Id.* Examination of her imaging results showed a chronic partial tear in her right hand.  *Id.* at 377.

---

[2] The Court predominantly focuses on the diagnoses and treatment Luz received as they relate to her ability to perform fine and gross manipulations using her right arm and hand, a medical issue that the ALJ did not adequately consider.  *See infra* Section III.  Because the Court need not reach Luz's other arguments, this section does not recount in detail the treatment Luz received for her other ailments.

[3] The Court cites to the Administrative Record as "R."

2

The next medical visit in the record was a visit to Dr. Osei on January 20, 2022.[4]  *Id.* at 391.  At that visit, Luz again complained of pain in her right hand and elbow.  *Id.* She reported feeling aches, numbness, and tingling that worsened with typing at work and which would wake her at night.  *Id.*  A medical examination demonstrated that Luz was hypermobile and had excellent range of motion.  *Id.* at 392.  The medical examination also demonstrated carpal tunnel syndrome and some muscle weakness.  *Id.*  Dr. Osei ordered studies of Luz's nerves to determine whether surgery was necessary.  *Id.* at 395.

About a week later, Dr. Osei scheduled Luz for surgery to treat her right hand and arm.  *Id.* at 418.  Her medical records indicate that her pain had progressively worsened over the prior year and had failed to improve with injections or physical therapy.  *Id.* at 489.  Luz was scheduled for surgery on February 28, 2022 and returned to the Hospital of Special Surgery for the procedure.[5] *Id.* at 418, 420.  Because Luz suffered from "cubital tunnel syndrome [and] had severe symptoms affecting life, and had failed nonoperative treatment," her physicians proceeded with surgery.  *Id.* at 499 ("[P]atient had failed non operative treatment of splinting, therapy, nerve glides, activity modification, NSAIDs, etc.").  Medical notes from the surgery indicated that Luz's ulnar nerve was thickened, hardened, and compressed.  *Id.* at 499–500.

---

[4] Dr. Osei stated that he saw Luz every one to six months after she first began seeing him in 2019. *See* 842.  Dr. Osei has a private practice.  *See* R. at 420 (listing "Dr. Daniel Osei's Practice at Belaire" as Luz's primary care center).  The record indicates that prior to 2022, Luz received more than one injection to treat her hand pain but only one injection is reflected by the Hospital of Special Surgery records for this time period.  *See id.* at 480.  It is unclear whether Luz received the additional injections at Dr. Osei's private practice.

[5] The order for Luz's surgery indicated the procedure was intended for her left arm and left hand but the procedure summary discloses that the procedure was performed on her right elbow and right hand. *Compare id.* at 418, *with id.* at 427.

3

Luz returned to the Hospital for Special Surgery about a week later on March 8, 2022.  *Id.* at 631.  She reported that her pain had improved.  *Id.*  On April 21, 2022, however, she returned again.  *Id.* at 647.  This time, she reported that while her pain had improved, she still had some numbness and tingling.  *Id.*  A medical examination indicated swelling in her forearm and tenderness in the elbow.  *Id.*

Several weeks later, Luz returned to see Dr. Osei on June 14, 2022.  *Id.* at 667.  She reported improved pain overall, and while she denied numbness and tingling, she stated that she continued to suffer shooting pains in her elbow which would occasionally wake her at night.  *Id.*  Luz continued to exhibit excellent range of motion.  *Id.* at 668.  At this time, Dr. Osei noted that Luz may be able to return to work, but he wanted to observe her over the course of the summer.  *Id.*

Luz returned for a follow-up on August 26, 2022.  *Id.* at 684.  She reported increased pain in her right elbow.  *Id.*  A medical examination reported that her range of motion remained excellent, but that Luz exhibited hypersensitivity in her forearm.  *See id.* at 685.  Luz reported experiencing severe difficulty with household chores, carrying bags, cutting food with a knife, tasks that required taking force in through her shoulder, hand, or arm, and even sleeping because the pain in her arm and hand would wake her at night.  *Id.* at 697.  Because Luz's increased pain was unusual, Dr. Osei ordered imaging to rule out the possibility of neuroma.  *See id.* at 685.

Luz returned on January 5, 2023 for re-evaluation of her right elbow pain.  *Id.* at 715.  She reported experiencing pain relief for about two months after the surgery before the pain returned and worsened.  *See id.*  A medical examination showed that Luz's range of motion remained excellent.  *Id.* at 716. An ultrasound, however, confirmed neuroma.  *Id.* at 715.  Dr. Osei provided Luz with a cortisone injection to relieve the pain and discussed surgery to treat the neuroma.  *Id.* at 715–17.  Luz had surgery on February 6, 2023 to excise the neuroma.  *Id.* at 741.  Two weeks

4

later, she reported feeling improved sensitivity, but she continued to experience shooting pains in her arm. *Id.* at 747.

A few months later, on May 31, 2023, Luz saw a different healthcare provider for a consultative evaluation of her social security claim. *See id.* at 805. She reported still feeling sensitivity and pain in her right elbow. *Id.* at 805. Her latest imaging from May 22, 2023 showed that despite the neuroma excision, her nerve remained enlarged and showed two new foci-like masses. *Id.* at 805, 810. A medical examination identified tenderness in her right forearm and elbow, decreased sensation in her right elbow and upper arm, decreased sensation in her finger on her left hand, and nerve irritation in her left wrist. *Id.* The consulting physician's medical examination indicated that her range of motion was normal but that she could not perform fine or gross hand manipulations. *Id.* at 805–06.

On June 6, 2023, Luz returned to the Hospital for Special Surgery. *Id.* at 824. Imaging of her right elbow confirmed the enlargement of the nerve in her elbow. *Id.* at 825. Dr. Osei advised Luz that further surgery could cause formation of another neuroma. *Id.* He advised trying cortisone injections for a few months and reevaluating her in September. *Id.*

Luz returned in September after the cortisone injections failed to relieve her pain or numbness. *Id.* at 826. She reported that her pain persisted and worsened when she flexed her elbow. *Id.* A medical examination revealed tenderness along her elbow, swelling, and excellent range of motion. *Id.* at 827. An ultrasound revealed two neuromas in Luz's elbow. *Id.*

Dr. Osei and Luz scheduled another surgery on November 3, 2023 to excise the neuromas. *Id.* at 828–29. Luz had a follow-up on November 14, 2023. *See id.* at 834. Treatment notes report that Luz was stable, her pain had improved, and that she had excellent range of motion. *Id.*

On January 18, 2024, Luz continued to report some relief in her elbow pain but noted that she still experienced pain when leaning on it. *Id.* at 856. At that time, the majority of her symptoms appeared to stem from her right shoulder where she was suffered from adhesive capsulitis. *Id.* Nevertheless, Luz continued to report difficulty with basic activities such as opening jars, household chores, carrying bags, using knives, recreational activities, and staying asleep because of the pain. *Id.* at 859–60.

Luz was then referred to another physician for her shoulder in March 2024. *Id.* at 892. While there, she reported elbow and shoulder pain, which worsened with activity, elevation, and rotation. *Id.*

### 2.    *Dr. Osei's opinion*

Dr. Osei submitted an opinion for the ALJ's consideration, dated February 27, 2024. *Id.* at 842–85. He noted Luz's long history of treatment and issues managing her carpal tunnel syndrome, cubital tunnel syndrome, recurring neuromas, and shoulder adhesive capsulitis. *Id.* He opined that Luz could occasionally lift things that weighed less than 10 lbs. and could occasionally use her right fingers and arm to reach for, grasp, twist, and turn objects. *Id.* He further opined that Luz was likely to have some good days and some bad, that she would likely be off task about twenty percent of the work day, and that she would need about four days off per month due to her impairments or need for treatment. *Id.*

### 3.    *Luz's testimony at the Hearing*

At the Hearing, Luz testified that her "whole hand, I can't use it." *Id.* at 44. She explained that she had several surgeries on her right arm to treat her pain and they had helped in the sense that it no longer felt like her skin was on fire and that it no longer hurt when others touched her. *Id.* at 45. She further explained that she felt cramps, numbness, and tingling in her hand. *Id.* at

45–46.  She also testified that while she could bend her elbow, she could only do so for up to a few minutes at a time because moving her elbow caused a knife-like stabbing pain in her arm.  *Id.*  She testified that she had trouble manipulating small objects.  *Id.* at 47.  Luz explained that she wears "easy" shoes "like the crocs" because she requires help putting other types of shoes on.  *Id.* at 49.

### B.    Procedural History

Luz filed an application for DIB on November 22, 2022.  *Id.* at 165–71.  Her application alleged that she had been disabled since April 1, 2020.  *Id.*  The SSA initially denied her application on July 18, 2023, and again upon reconsideration on October 6, 2023.  *Id.* at 85–94.  Luz then requested a hearing, which Ricardy Damille conducted on April 2, 2024 (the "Hearing").  *Id.* at 35, 95.  The ALJ issued an unfavorable decision on July 22, 2024.  *Id.* at 14–26.

Luz appealed the ALJ's decision to the SSA Appeals Counsel, which denied review on April 17, 2025.  *Id.* at 1–6.  Luz filed this Appeal on June 20, 2025.  D.E. 1 ("Complaint" or Compl.").  The Commissioner of the SSA (the Commissioner") filed the Administrative Record on August 20, 2025.  R.  Luz's brief followed.  D.E. 7 ("Brief").  The Commissioner filed an opposition.  D.E. 11 ("Opp'n").  Luz did not reply.

### C.    The ALJ's Decision

To qualify for DIB, a claimant must show she is disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E).  Disability is the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A).  The medically determinable impairment must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his

age, education, and work experience, engage in any other substantial gainful work that exists in the national economy. *Id.* § 423(d)(2)(A).

The ALJ followed the five-step sequential evaluation procedure for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Claimants bear the burden of proof at steps one through four while the Commissioner bears the burden of proof at step five. *Smith v. Comm'r Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). At step one, the ALJ determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Here, the ALJ found that Luz had not engaged in substantial gainful activity since April 1, 2020. R. at 19.

At step two, the ALJ decides whether the claimant has a "severe impairment" or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). Here, the ALJ found Luz suffered from the following severe impairments: degenerative disc disease of the cervical spine, bilateral carpel tunnel syndrome, antebrachial cutaneous nerve injury, right shoulder adhesive capsulitis, bilateral ulnar neuropath, and status-post two excision surgeries of right medial antebrachial cutaneous neuromas. R. at 20. The ALJ agreed that Luz's medically determinable impairments significantly limit her ability to perform basic work activities. *Id.*

At step three, the ALJ decides whether the claimant's impairments meet or equal the severity of an impairment in the Listing of Impairments found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, the claimant is presumed to be disabled if the impairment(s) has lasted or is expected to last for a continuous period of at least twelve months. *Id.* § 404.1509. Otherwise, the ALJ proceeds to step four. Here, the ALJ found that Luz did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1. R. at 20.

8

At step four, the ALJ must determine what the claimant's residual functional capacity ("RFC") is and whether the claimant can perform past relevant work.  20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f).  If the claimant is unable to perform past relevant work, the ALJ proceeds to step five.  Here, the ALJ found that Luz could not perform her past relevant work and that she had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

> can occasionally push and/or pull with the upper extremities; occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch and crawl; occasionally reach overhead with the right upper extremity, which is the dominant hand; and frequently handle, finger and feel with the upper extremities.

R. at 21.

At step five, the ALJ must determine whether the claimant can perform other substantial gainful work which exists in the national economy.  20 C.F.R. § 404.1520(g).  ALJs usually make this determination with the assistance of vocational expert ("VE") testimony.  *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201-02 (3d Cir. 2019).  VE examination "typically involves 'one or more hypothetical questions posed by the ALJ to [a] vocational expert.'"  *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).  The ALJ's questions to the VE must accurately reflect the claimant's impairments.  *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).  The VE will then provide testimony regarding whether, given the claimant's physical capabilities, he can perform certain jobs listed in the Dictionary of Occupational Titles ("DOT").  *See Maria B. v. Kijakazi*, No. 21-2009, 2022 WL 17733680, at *2 (D.N.J. Dec. 16, 2022).  If the claimant is unable to perform those jobs, he is presumed to be disabled if his impairments have lasted or can be expected to last over a continuous period of at least twelve months.  *N.M. v. Comm'r of Soc. Sec.*, No. 23-1093, 2024 WL 1006288, at *2 (D.N.J. Mar. 8, 2024).

At the Hearing, the ALJ determined that given Luz's age, education, work experience, and RFC, she could perform jobs that exist in significant numbers in the national economy. R. at 29. Accordingly, the ALJ determined that Luz was not disabled within the meaning of the Act. *Id.* at 29–30.

## II.    LEGAL STANDARD

Judicial review of an SSA determination is based upon the pleadings and the transcript of the record. The scope of that review is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the ALJ's findings of fact. *See* 42 U.S.C. § 405(g) ("The findings . . . as to any fact, *if supported by substantial evidence*, shall be conclusive." (emphasis added)); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999) ("[W]e have plenary review of all legal issues . . . and review the ALJ's findings of fact to determine whether they are supported by substantial evidence.").

"Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)). A "single piece of evidence," however, "will not satisfy the substantiality test if the Commissioner ignores, or fails to resolve, a conflict created by countervailing evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

If faced with conflicting evidence in the Record, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." *Kirby v. Comm'r of Soc. Sec.*, No. 16-5159, 2017 WL 4330361, at *5 (D.N.J. Sept. 29, 2017) (quoting *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987)). The Court must determine "whether

the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision." *Dunster v. Dudek*, No. 24-469, 2025 WL 622333, at *4 (M.D. Pa. Feb. 26, 2025) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)). An ALJ's finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Decisions with conclusory findings or which indicate the ALJ failed to consider all the evidence are not supported by substantial evidence. *See id.* at 705-06. The Court must also ensure the ALJ did not "reject evidence for no reason or for the wrong reason." *Id.* at 706 (citing *King v. Califano*, 615 F.2d 1018 (4th Cir. 1980)).

## III.    REVIEW OF THE ALJ'S OPINION

Luz contends that at step four the ALJ did not properly and fully consider her subjective complaints of pain, which were corroborated by the medical record and by physician opinions, and were therefore entitled to great weight and serious consideration. Because the Court agrees that the ALJ did not adequately consider the evidence before him regarding Luz's pain in his assessment of Luz's RFC, the Court will **GRANT** Luz's Appeal, **VACATE** the ALJ's denial of benefits, and **REMAND** for further proceedings consistent with this Opinion.

### A.    Step Four

At step four, "the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work." *Burnett*, 220 F.3d at 120. This analysis requires making factual findings regarding what the claimant's RFC is and whether she is able to perform "sedentary," "light," "medium," "heavy," or "very heavy" work. *Id.* (citing 20 C.F.R. §§ 404.1561, 404.1567). A claimant's RFC is work that "an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft v. Apfel*, 18 F.3d 358, 359 n.1 (3d Cir. 1999)

11

(quoting 20 C.F.R. § 404.1545(a)).  In determining what a claimant's RFC is, "the ALJ must consider *all* evidence before him."  *Burnett*, 220 F.3d at 121 (emphasis added).

When the record includes a claimant's subjective reports of pain, ALJs must seriously consider those reports, "even where not fully confirmed by objective medical evidence."  *Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984) (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981)).  And when a claimant's subjective reports of pain *are* supported by medical evidence, ALJs must give them "great weight."  *Id.* (citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981)).  An ALJ is not free to discount a "claimant's pain without contrary medical evidence when the claimant's testimony is reasonably supported by medical evidence."  *Id.* (citing *Smith*, 637 F.2d at 972).

Here, Luz's medical record, testimony, and her long-time treating physician's opinion all confirm that she suffers debilitating pain in her right elbow that limits the extent to which she may bend it and use her arm to manipulate objects, such as by twisting, grasping, and turning.  While the ALJ evaluated significant aspects of Luz's medical record, his determination of Luz's RFC did not properly incorporate and address the limitations she faces due to pain.[6]

### 1.    *Medical evidence substantiates the persistency and severity of Luz's pain*

As described in detail above, *see supra* Section I.A.1, Luz has been suffering from persistent and severe pain in her elbow due to her reoccurring neuropathy and other medical issues since around 2019.  While the record reflects brief respites from the pain immediately following surgery, Luz's pain has reliably returned, and she has consistently suffered diminished use of her right arm and hand.  Her treatment notes consistently report pain with elbow flexion and pain with

---

[6] Because this Court finds that the ALJ's failure to properly address Luz's subjective reports of pain, the Court need not address Luz's other arguments for vacatur.

activity, elevation, and rotation of her elbow.  Although portions of her medical history indicate that her pain improved following surgery, the same medical reports document her pain's consistent.

### 2.    *Dr. Osei opined that Luz suffered from diminished use of her hand*

Dr. Osei began treating Luz in September 2019 and continued to see her every one to six months.  R. at 842.  In an opinion he authored for the ALJ's consideration, he reported that Luz suffered from pain, numbness, tingling, and hypersensitivity in her right elbow and shoulder, among other things.  *Id.*  He explained that because of Luz's pain and need to recover from surgery, Luz would need to take unscheduled breaks during work, would be off task about twenty percent of the workday, and would only be able to use her hands and arms up to one-third of the workday. *Id.* at 843–45.  He specifically explained that she could only occasionally grasp, turn, and twist with her right hand. *See id.*; *see also* Social Security Ruling 83-10 (defining "occasionally" as "occurring from very little up to one-third of the time").

### 3.    *Luz's testimony at the Hearing*

At the Hearing, Luz testified that she felt unable to take on any employment involving physical work because "my whole hand, I can't use it."  R. at 44.  She explained that the several surgeries to address the neuropathy in her elbow had helped; it no longer felt like her skin was burning.  *Id.* at 44–45.  She still, however, suffered from cramps and stabbing pains in her right arm and numbness in her hand.  *Id.* at 45–46.  She testified that although she could bend her right elbow, it caused her pain to do so.  *Id.* at 46.  As a result, she could only bend her elbow for a few minutes at a time.  *Id.*  Luz further testified that the pain in her arm and the numbness in her hand prevented her from completing basic activities like opening jars, typing, and writing.  *Id.* at 47.

### 4.    *The ALJ erred by failing to accord great weight to Luz's pain*

The ALJ determined that Luz could "frequently" grasp, twist, and turn, and explained that this "frequency" limitation accounted for Luz's pain. *Id.*  But Luz's testimony and Dr. Osei's opinion indicated that a greater limitation was necessary.  Because Luz suffered from medically determinable impairments that could reasonably be expected to produce her alleged symptoms— which the ALJ agreed with, *see id.* at 22—the ALJ was not free to discount such testimony and opinion in the absence of contradictory evidence.

In coming to this "frequency" conclusion, the ALJ explained that the need for a greater limitation was unsupported by the record because medical examinations (1) showed a normal range of motion, intact grip strength, and "only minimally decreased strength," and (2) did not show tremors, atrophy, or a lack of coordination.  *Id.* at 28.  It appears that the ALJ considered these symptoms (and the Record's silence regarding other symptoms) inconsistent with Luz's and her physician's reports of pain, but the ALJ did not explain why.

Indeed, in reviewing Luz's medical history, the ALJ noted that the record repeatedly documented Luz's struggles with pain, even where, for example, her range of movement and mobility were otherwise intact.  *See, e.g.*, *id.* at 24 (noting that although claimant had "excellent range of motion" in March 2023, she nevertheless experienced cramping, swelling, and pain in her elbow and forearm); *see also, e.g.*, *id.* at 392 (documenting Luz's hypermobility).  The ALJ's conclusion that Luz's excellent range of motion somehow undermined the reported severity of her pain is therefore not only unsupported itself, but at odds with her medical record.  The ALJ cannot merely refer to parts of the record and invoke terms such as "contrary" or "unsupported" to conclude that some evidence is inconsistent with other evidence.  *See Mock v. Shalala*, No. 94-4191, 1995 WL 80122, at *2–3 (E.D. Pa. Feb. 27, 1995) (finding that the ALJ committed error by

14

inappropriately concluding that the claimant's ability to perform a wide range of activities was "contrary" to her reported degree of pain).  The ALJ does not have the discretion to discredit a claimant's corroborated reports of pain by substituting in his own medical judgment.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

Because the ALJ discounted the severity of Luz's pain without adequate explanation, the ALJ's conclusion that Luz could frequently grasp, turn, and twist lacks foundation.  *Cotter*, 642 F.2d at 705 (explaining that factual findings should be "as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision").  The ALJ therefore erred.

> 5.    *The ALJ's error was material*

Finally, the ALJ's error was material because at the Hearing, the vocational expert testified that if Luz's ability to handle and manipulate objects was limited to occasional, there were no jobs that existed in the national economy that she could perform at the light level.  R. at 58.  Because of Luz's age, a finding that she is limited only to sedentary work may lead to a finding of disability. *See Razey v. O'Malley*, No. 23-1298, 2024 WL 4266554, at *3 (W.D. Pa. Sept. 23, 2024).

## IV.    CONCLUSION

Based on the foregoing, the Court will **GRANT** Luz's Appeal, **VACATE** the ALJ's denial of benefits, and **REMAND** to the SSA for further consideration of Luz's pain and the impact it may have on her residual functional capacity and ability to engage in light work.  Because further consideration of the evidence may impact the ALJ's analysis at both steps four and five, the Court will leave any challenges to those steps to the Commissioner on remand.  Accordingly, the Court remands this matter to the Commissioner for proceedings consistent with the Order.

Dated: May 19, 2026

_____
Evelyn Padin, U.S.D.J.

16